```
                    UNITED STATES DISTRICT COURT
                             FOR THE
                      DISTRICT OF VERMONT
```

UNITED STATES OF AMERICA        :
                                :
                                :       Case No. 2:10-cr-131
        v.                      :
                                :
                                :
FRANK ANNETTE,                  :
                                :
                Defendant.      :

## Memorandum Opinion and Order: Motion to Suppress Proffer Statements

Defendant Frank Annette stands accused of leading a drug conspiracy that transported crack cocaine and heroin from New Haven, Connecticut to sell in Windsor, Vermont. In March 2011, Annette was arraigned on a three-count indictment, and his jury trial on those charges is scheduled to begin May 29, 2012. In advance of trial, the government filed a motion in limine to, *inter alia*, admit against Annette statements he provided to the government in a proffer session. ECF No. 188. Annette opposed the motion, moving to suppress, ECF No. 195, and the Court conducted a suppression hearing on May 18, 2012. *See* Minute Entry for Proceedings, ECF No. 203. At the hearing's conclusion, the Court issued an oral decision to allow the government to use the proffer statements for impeachment or rebuttal. The Court now files this written opinion to affirm the bench ruling and to further clarify that the proffer

agreement permits the government to introduce Annette's proffer statements against him for any purpose at trial. As such, the government's motion in limine is **granted** and Annette's motion to suppress is **denied**.

## Background

With the case two weeks from jury draw, in mid-September 2011, the government turned over to Annette a detailed account of the evidence it intended to rely upon at trial. Annette's court-appointed attorney, Brooks McArthur, studied the evidence with Annette over the course of two meetings. Prior to that time, McArthur had carefully explained to Annette the general nature of proffer sessions, and strategic concerns involved in entering one. Annette previously had been opposed to cooperating with the government, and McArthur initially had agreed. In studying the newly-released documents with Annette, however, McArthur told his client that the government's case would make it difficult to mount an effective defense. McArthur then testified that Annette asked him: "what can I do to help myself out?" When McArthur raised the possibility of a proffer, Annette reacted positively, saying he had information that might be useful to the government on crimes in Connecticut. McArthur cautioned that entering into a proffer would render a trial defense virtually impossible, given that Annette would be

2

required to admit criminal conduct. Annette said he understood, and McArthur immediately phoned the lead prosecutor in the case, Assistant United States Attorney Craig Nolan. Nolan agreed to arrange a proffer, but noted that given the late date, the government would need "big things" from Annette before it could offer him a cooperation deal. McArthur relayed the news to Annette who agreed to go forward, and the proffer was set for the following business day, a Monday.

Prior to the proffer, Nolan provided McArthur a one-page letter outlining the terms under which Nolan's office would conduct the interview (the "Agreement"). ECF No. 193-1. Both Nolan and McArthur described it as the government's standard form. Prior to entering the interview, McArthur went through the Agreement line-by-line privately with Annette, explaining the ramifications of each sentence. The Agreement opens by stating: "This Office agrees that any information that your client provides pursuant to this agreement will not be used directly against him in a criminal prosecution or sentencing proceeding." However, it stakes out three exceptions to that general rule. First, the government reserves the right to use any "leads or information derived from the information that your client provides" against Annette in a future proceeding. Second, it permits the prosecution to introduce proffer

statements "to rebut any evidence offered by or on behalf of your client at any stage of the criminal prosecution" (the "Rebuttal Clause"). It gives as an example that the government may use such evidence to impeach Annette if he were to testify. It further states that "your client waives any claim that he may otherwise have under applicable law that such information is inadmissible in a civil or criminal proceeding." McArthur told Annette those provisions would allow the government to use Annette's statements against him at trial and prevent him from objecting. Lastly, the Agreement states that Annette must "agree[ ] to provide truthful and complete information." To "knowingly provide[ ] false or misleading statements" would render the Agreement "null and void," and give the government the right to introduce any statements made by Annette "against him without limitation and for any purpose in any proceeding" (the "Total Waiver Clause"). McArthur said he emphasized repeatedly that, in light of those terms, Annette had to be 100 percent truthful or he would have no protection against the government's use of his statements at trial.

McArthur said Annette made clear he understood the Agreement's terms, and Annette and McArthur signed the letter. Above their signatures is an acknowledgement:

> I, Frank Annette, have read the above letter,
> discussed it fully with my attorney, Brooks McArthur

> and understand the terms fully.  There are no promises
> or understandings between the United States Attorney
> and myself other than those described above.

As the session began, Nolan explained the Total Waiver Clause a second time and told Annette that he could stop the interview at any point to confer with McArthur.  McArthur was present for the first hour of the interview but had to leave twice to attend another client's arraignment in the same building.  Before leaving both times, he made certain that Annette did not want to pause the interview during his absence.  In addition to Nolan, McArthur, and Annette, two federal agents in Vermont attended in person and two FBI agents stationed in New Haven participated via videoconference.

The parties agree Annette provided a mostly truthful account of his criminal history and contacts, both in Vermont and in Connecticut.  In fact, James Lawton, one of the New Haven FBI agents involved, stated that had Annette testified for the government, he might have helped close several significant Connecticut cases.  However, the government contends Annette also lied about two important particulars.  First, he claimed he removed Phillip Amoroso, his Windsor drug distributor, to Connecticut to help him detox, rather than to interrogate him to determine if he was cooperating with the authorities.  Second, he stated that while in Connecticut with Amoroso, he threatened

5

Amoroso with a novelty knife, and not a gun as Amoroso had claimed.

After the session, Nolan phoned McArthur to say the government would not use Annette as a cooperating witness and that it instead planned to file a motion in limine to allow it to introduce the proffer statements at trial. Nolan also extended a plea offer similar to one he had proposed prior to the session, and Annette rejected it. Soon after, Annette changed attorneys, citing longstanding trust and communication problems with McArthur. He claimed, at the hearing on McArthur's motion to withdraw, that McArthur had assured him that nothing said in the proffer session could be used against him at trial.

## Discussion

The government argues that since Annette lied, his proffer admissions are admissible for any purpose under the Agreement's Total Waiver Clause. In the alternative, the government urges the Court to enforce the Rebuttal Clause, under which it could introduce Annette's proffer statements to impeach his testimony or to rebut evidence he elicits.

Federal Rule of Evidence 410 largely forbids the government from admitting statements made in failed plea discussions

6

against the defendant at trial.[1]  In *United States v. Mezzanatto*, the Supreme Court held that the general presumption that evidentiary rules may be waived applies to Rule 410.  513 U.S. 196, 203-04 (1995).  The Court reversed a Ninth Circuit decision that held unenforceable an agreement to allow the government to introduce proffer statements to impeach the defendant.  *Id.* at 199, 211.  The Supreme Court found no relevant policy rationale offered by the defendant, such as maintaining the integrity of the judicial process, encouraging settlement, and preventing prosecutorial overreach, sufficient to overcome the presumption that waiver is permitted.  *Id.* at 204-10.  Instead, it held that "absent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement Rules is valid and enforceable."  *Id.* at 210.  Accordingly, the principal issues here are whether Annette knowingly and voluntarily entered into the proffer agreement and, if he did, whether and how the government may enforce it against him.

**I.   Knowing and Voluntary Entry into the Agreement**

"A waiver is made knowingly if the defendant has 'a full awareness of both the nature of the right being abandoned and

---

[1] Rule 410 is cross-referenced in Federal Rule of Criminal Procedure 11(f).

the consequences of the decision to abandon it,' and it is voluntary if it is 'the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *United States v. Velez*, 354 F.3d 190, 196 (2d Cir. 2004) (quoting *Moran v. Burbine,* 475 U.S. 412, 421 (1986)).[2]

The Court finds the record amply demonstrates Annette made a knowing waiver of his rights. McArthur carefully explained the Agreement to Annette line-by-line, pausing to describe, among other provisions, the Rebuttal and Total Waiver Clauses and their grave implications. Annette indicated he understood, signed the agreement, and went ahead with the proffer. Nolan further explained the absolute need for candor, and Annette had the option to stop the hearing at any point to confer with his lawyer. Absent McArthur remaining with Annette throughout the

---

[2] There is a split of authority within the Second Circuit as to which party bears the burden of proving that a proffer agreement was entered into knowingly and voluntarily. *Compare United States v. Paris*, No. 3-06-cr-64 (CFD), 2007 WL 1158118, at *4 (D. Conn. Apr. 18, 2007) ("The government must show by a preponderance of the evidence that Paris waived the provisions of FRE 410 knowingly and voluntarily."), *with United States v. Morrison*, 515 F. Supp. 2d 340, 348 (E.D.N.Y. 2007) ("the following cases, directly or by analogy, indicate that the burden of proof rests with the defendant who seeks to extricate himself or herself from terms of the proffer agreement which gave rise to the targeted proffer statement"). The Court need not resolve that question today as even if the government bears the burden, it has carried it beyond a preponderance of the evidence.

proffer session, defense and government counsel could scarcely have been more thorough in ensuring Annette was aware of both the benefits and perils of the Agreement. Nor is there any evidence Annette's participation was coerced or that he was deceived so as to make his consent involuntary. Annette only sought to enter the proffer after months of weighing the charges against him and detailed review of the government's evidence with his attorney. McArthur only pursued the proffer session on Annette's instruction and no party forced Annette to divulge criminal conduct.

Annette's primary argument is that he was deceived, in that the government had no intention of giving him a reduced sentence and a cooperation agreement in return for his damaging admissions. He cites the fact that the FBI had interest in his Connecticut information, but that the government nonetheless rejected him as a cooperating witness. Annette's argument is first undermined by the fact that even though the government decided not to extend Annette a cooperation agreement, it gave him another opportunity to accept a reduced sentence in exchange for a guilty plea. Furthermore, the Agreement did not entitle Annette to a deal. Proffer agreements provide the defendant with "'the opportunity to be heard.'" *United States v. Parra*, 302 F. Supp. 2d 226, 239 (S.D.N.Y. 2004) (quoting *United States*

*v. Gomez*, 210 F. Supp. 2d 465, 475 (S.D.N.Y. 2002)).  Annette received an opportunity to negotiate a deal.  The government was not required to extend him a cooperation agreement, and the Court does not see any evidence that the government entered the proffer session in bad faith.  The government had the right, for instance, to determine that it could not rely on Annette to be a credible witness because of his untruthfulness.  The Court determines that Annette entered into the proffer session knowingly and voluntarily.

## II. Enforcing the Proffer Agreement

The government argues that Annette "knowingly provided false or misleading statements" about the trip with Amoroso, triggering the Total Waiver Clause.  Annette maintains that his co-conspirators' statements about what happened conflict, undermining the government's conclusion.  The Court reserved judgment to review the record.  The Court has already found Amoroso's testimony about the relevant details of the incident credible.  Amoroso first testified at a November 2010 hearing in which the Court ordered Bernard Doherty, Annette's co-conspirator, detained pending trial.  The Court found Amoroso was "essentially kidnapped" by Annette and Doherty.  Hr'g on Mot. for Review of Release Order Tr., Gov't's Trial Mem. Ex. 3 ("2010 Hr'g Tr."), at 52, ECF No. 193-3.  It also relied upon

Amoroso's "chilling" description of being threatened by Annette with a gun. 2010 Hr'g Tr. 53. Amoroso, and two other co-conspirators, Paul Keeler and Benjamin Bridge, provided further testimony on the Connecticut trip during Doherty's April 2012 sentencing before the Court. That testimony is in all important respects consistent with Amoroso's November 2010 testimony and does not change the Court's credibility determination. In light of the compelling evidence contradicting Annette's proffer session account, the Court concludes he knowingly misled the government as it relates to the trip with Amoroso and the use of a weapon. He thus violated the Total Waiver Clause of the proffer agreement.

The Total Waiver Clause is also enforceable against Annette. The Second Circuit has applied the Supreme Court's reasoning in *Mezzanatto* beyond the impeachment waiver narrowly at issue in that case. *See, e.g.*, *United States v. Barrow*, 400 F.3d 109 (2d Cir. 2005). It has construed rebuttal waiver provisions to permit the government to introduce proffer statements in its case-in-chief should the defendant challenge the government's substantive evidence on cross or in its opening statement. *Id.* at 117 n.7 ("We are not convinced that the admission of proffer statements in the government's case-in-chief necessarily constitutes error."). The Second Circuit has

not yet dealt with a waiver provision as broad as the Total Waiver Clause. However, analogous to the present case, courts applying *Mezzanatto* have nearly uniformly approved of total waivers made in consideration of sentencing assurances. *United States v. Mitchell*, 633 F.3d 997, 998 (10th Cir. 2011); *United States v. Sylvester*, 583 F.3d 285 (5th Cir. 2009); *United States v. Burch*, 156 F.3d 1315, 1321-22 (D.C. Cir. 1998); *United States v. Stevens*, 455 F. App'x 343, 345 (4th Cir. 2011) (unpublished decision); *United States v. Mergen*, 06-cr-352 (NGG), 2010 WL 395974, at *4 (E.D.N.Y. Feb. 3, 2010); *see United States v. Young*, 223 F.3d 905, 911 (8th Cir. 2000) (finding that such an agreement in connection with granting pre-trial release on bond was entered into knowingly and voluntarily and that it was therefore enforceable).

While fewer cases appear to have grappled with a total waiver that is conditioned on the defendant's candor in a proffer session, the Court finds that such a term is similarly enforceable. *See United States v. Nesbitt,* No. 2:08-cr-1153-DCN, 2010 WL 3701337 (D.S.C. Sept. 14, 2010). While it creates a steep risk to the defendant, it also can only be triggered in the limited circumstance that the defendant provides knowingly false or misleading information. The defendant may avoid its consequences simply by being truthful. "What he does not have

12

the right to do, however, is lie." *Gomez*, 210 F. Supp. 2d at 476. Since Annette misled the government knowingly, it may enforce the Total Waiver Clause by using his proffer statements against him at trial.

## Conclusion

For the foregoing reasons, the Court grants the government's motion in limine and denies Annette's countervailing motion to suppress.

Dated at Burlington, in the District of Vermont, this 22nd day of May, 2012.

/s/William K. Sessions III<br>
William K. Sessions III<br>
U.S. District Court Judge